USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/8/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
KELLY CAMPBELL CORNELIUS, on behalf of herself :
and all others similarly situated :
:
Plaintiff, : 19-cv-11043 (LJL)
:
-v- : OPINION & ORDER
:
WELLS FARGO BANK, N.A., :
:
Defendant. :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") moves to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and to stay the proceedings before the district court.

## BACKGROUND

On December 12, 2019, Plaintiff Kelly Campbell Cornelius filed on behalf of herself and a putative class of others similarly situated a class action complaint containing claims for violation of the New York General Business Law § 349 and breach of contract. Dkt. No. 1 ("Complaint" or "Compl.").

Plaintiff is a citizen of South Carolina and owns and operates a small restaurant in Columbia, South Carolina named Tios Mexican Cantina. *Id.* ¶ 8. On two occasions, in April 2014 and again in October 2015, she signed lease agreements with a financing company named Northern Leasing Systems, Inc. ("Northern Leasing") to lease credit card processing equipment. *Id.* at ¶ 17. On April 29, 2014, she leased an Ingenico iCT220 pin pad for $6,342 to be paid in 48 monthly installments of $129 plus a $150 restocking fee at the end of the lease; Plaintiff

alleges that the pin pad was worth approximately $150. *Id.* ¶ 17(a). On October 29, 2015, she leased a Dejavoo Z8 wireless pin pad and a VeriFone P1000 power cord for $17,430 to be paid in 48 monthly installments of $360 plus a $150 restocking fee at the end of the lease; Plaintiff alleges the equipment was worth approximately $210 and $20, respectively. *Id.* ¶ 17(b). Plaintiff apparently defaulted on the leases. On April 3, 2019, Northern Leasing obtained a default judgment against Plaintiff in the Civil Court of New York City in the amount of $9,822.52. Dkt. No. 1-5.

On or about May 20, 2019, Northern Leasing served an information subpoena and retraining notice on Defendant pursuant to N.Y. C.P.L.R. 5222(b).[1] Compl. ¶ 26. The restraining notice forbade Defendant from transferring "any property in which [Plaintiff] has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated" or one year from the restraining notice had passed. Dkt. No. 1-6. The notice was issued from the Civil Court of the City of New York, and it is alleged that service was made on Defendant in New York. Compl. ¶ 26. In response to the

---

[1] N.Y. C.P.L.R. 5222(b) provides in part: "A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. . . . Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs."

notice, Defendant restrained $19,483.00 in funds on deposit in Plaintiff's South Carolina savings account with Defendant (the "Deposit Account"). *Id.* ¶ 27.

Plaintiff alleges that Defendant had a financial interest in the enforcement of Northern Leasing's leases because it agreed to accept assignment of Northern Leasing's leases as a security for a loan to Northern Leasing and, pursuant to that loan, possessed held all lessor rights under these leases. *Id.* ¶¶ 22-24. The leases indicated on their face that Northern Leasing had "assigned to Wells Fargo . . . all right, title and interest of lessor in and to this lease, all present and future rental, lease and other payments and charges owed to lessor and all products and proceeds thereof, pursuant to the Loan and Security Agreement, dated October 30, 2018, as heretofore amended between Wells Fargo and Lessor." Dkt. Nos. 1-1, 1-2.

Plaintiff alleges that Defendant had no legal basis for restraining her funds. She argues that, under New York law, a judgment creditor's serving of a restraining notice on a garnishee bank's New York branch is ineffective under the "separate entity rule" to freeze assets held in the bank's out-of-state branches, and that a judgment creditor must instead serve a restraint on the branch in which the account is kept because, for enforcement purposes, a bank account is deemed property of the judgment debtor only at that branch.[2] Compl. ¶ 28. Therefore, Plaintiff

---

[2] Plaintiff relies on the New York Court of Appeals decision in *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 163 (2014), which held that "a judgment creditor's service of a restraining order on a garnishee bank's New York branch is ineffective under the separate entity rule to freeze assets held in the bank's foreign branches," and a New York Civil Court's application of that rule to assets held in out-of-state branches, *see Lease Fin. Group, LLC v. Fiske*, 2 N.Y.S.3d 851, 853 (N.Y. Civ. Ct. 2014) (holding that service of restraining notice on Wells Fargo Pennsylvania branch was not sufficient to restrain judgment debtor's bank account in Georgia under the separate entity rule). Dkt. No. 23 ("Opp. Br.") at 8-9. Defendant responds with pre-*Motorola* decisions for the proposition that service of a restraining order on a bank over which the court has personal jurisdiction is effective to restrain funds in out-of-state bank accounts. Dkt. No. 22 at 3 (citing *McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 265 (E.D.N.Y. 2011); *Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533 (2009)). Defendant also argues that language in the Deposit Account Agreement to which Plaintiff was party and that

3

argues, a New York court does not have jurisdiction to seize property located in South Carolina, including bank accounts at South Carolina branches of national banks. *Id.* Plaintiff alleges that to enforce a New York judgment by seizing assets in South Carolina, Northern Leasing had to domesticate the judgment according to South Carolina law, which would have required Plaintiff to be given notice and an opportunity to appear and to seek relief from a foreign judgment. *Id.* ¶ 30 (citing S.C. Code §§ 15-35-900, 35-940).

Plaintiff argues that these facts support a claim against Defendant: by restraining Plaintiff's funds based on an undomesticated foreign judgment served outside the state of South Carolina, Defendant deprived Plaintiff of the rights guaranteed to her by South Carolina law. Plaintiff further alleges that Defendant knew the restraining notice was invalid and that Defendant's enforcement was unlawful but it persisted nonetheless because of the financial interest it had in the funds by virtue of the assignment in the leases. *Id.* ¶ 31. Specifically, Plaintiff claims that Defendant "knew that domestication of the default judgments enforcing the leases assigned to it would provide notice of the judgments to its depositors, who could then have the fraudulently obtained judgments set aside," and as a result, it "deceptively told Plaintiff . . . that it was merely acting as a garnishee when in fact it was acting to enforce its own pecuniary interest in the default judgments." *Id.* ¶ 6.

Northern Leasing is alleged generally to be a bad actor. In November 2018, the Attorney General of New York and the Deputy Chief Administrative Judge of the Civil Court for the City of New York filed an action to void Northern Leasing's contracts, vacate Northern Leasing's

---

states Defendant "will accept and act on any legal process we believe to be valid, whether the process is served in person, by mail, by electronic notification, or at any banking location" was sufficient to permit Defendant to restrain the funds in Plaintiff's account. *Id.* The Court need not resolve this issue to decide this motion. That is for the arbitration.

default judgments, force Northern Leasing to disgorge the fraudulently obtained money, and ultimately dissolve Northern Leasing. *Id.* ¶ 3 (citing Re-Notice of Petition, *People of the State of New York, et al. v. Northern Leasing Systems, Inc. et al.*, Index No. 450460/2016 (N.Y. Sup. Ct. Nov. 30, 2018)). The press release for that lawsuit, which is referenced in the complaint, states in part:

> On April 11, 2016, the New York State Attorney General filed a lawsuit against Northern Leasing Systems, Inc., a New York company, and several of its affiliated companies, including Lease Finance Group LLC, MBF Leasing LLC, Pushpin Holdings LLC and others (collectively "Northern Leasing"), as well as principal, Jay Cohen a/k/a Ari Jay Cohen, law firm Joseph I. Sussman, P.C., and other individuals involved in Northern Leasing's operations, alleging that these entities engaged in fraudulent and deceptive practices that trap small business owners and employees across the country into lease agreements for over-priced credit card processing equipment. The lawsuit further alleges that Northern Leasing and their attorneys abused the judicial process by suing to collect on these leases in the Civil Court of the City of New York, regardless of where the individual sued resides or where the transaction occurred. The majority of individuals sued lived in states other than New York. Some lived as far away as California.

*Id.* ¶ 15.

Thus, Plaintiff brings this claim not only on behalf of herself but purportedly on behalf of a class of persons or entities in the United States who (i) are or were judgment debtors of Northern Leasing, (ii) hold or held deposit accounts with Defendant, and (iii) had funds in their Defendant accounts restrained pursuant to process for the enforcement of judgments in favor of Northern Leasing issuing from jurisdictions other than the jurisdiction in which their Defendant accounts were located during the Class Period. *Id.* ¶ 35.[3]

Plaintiff brings two claims against Defendant. First, she alleges Defendant violated New York General Business Law § 349, which provides that "deceptive acts or practices in the

---

[3] The Complaint defines the Class Period as "the applicable limitations period to the present." Compl. ¶ 7.

conduct of any business, trade or commerce or in the furnishing of any service in [New York] are . . . unlawful." *Id.* ¶ 49.  Second, she alleges that Defendant breached the agreement governing her Deposit Account ("Deposit Account Agreement") "when it acted on legal process it knew to be invalid to restrain funds in Plaintiff['s] . . . accounts, for the purpose of advancing Wells Fargo's own pecuniary interests at the expense of Plaintiff." *Id.* ¶ 61; *see* Dkt. Nos. 20-2, 20-3.

In response to the Complaint, Defendant filed a motion to compel arbitration on February 18, 2020, based on a clause in the Deposit Account Agreement that mandates arbitration and expressly prohibits Plaintiff from commencing or participating in class or representative actions. Dkt. No. 19.

**DISCUSSION**

Section 2 of the FAA provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The federal substantive law of arbitrability, created by this provision, favors arbitration.  Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  A court ruling on a petition to compel arbitration generally must decide two issues: (1) whether the parties agreed to arbitrate, and (2) if so, whether the scope of the agreement encompasses the claims at issue.  *See Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

Section 3 of the FAA, which provides for a stay of litigation in any case raising a dispute referable to arbitration, and Section 4 of the FAA, which permits a party to seek an affirmative order to engage in arbitration, "[b]oth . . . call for an expeditious and summary hearing, with only restricted inquiry into factual issues." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 22. In deciding a motion to compel arbitration under the FAA, "the Court applies a 'standard similar to that applicable to a motion for summary judgment.'" *Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 386 (S.D.N.Y. 2017) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)); *see also Doe #1 v. College Board*, 2020 WL 882019, at * 4 (S.D.N.Y. Feb. 24, 2020) (stating same); *Worthington v. JetSmarter Inc.*, 2019 WL 4933635, at *3 (S.D.N.Y. Oct. 7, 2019) (same). As on a motion for summary judgment, the parties may submit documents in support or opposition of their motion, and the court "consider[s] all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). If the party seeking arbitration demonstrates its entitlement to arbitration by a showing of evidentiary facts, the burden then shifts to the opposing party to submit evidentiary facts demonstrating there is a dispute of fact showing that the agreement is inapplicable or invalid. *See Zhu*, 291 F. Supp. 3d at 386; *see also Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010). A party opposing arbitration may not satisfy this burden through "general denials of the facts on which the right to arbitration depends." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

A. **Whether the Court Should Compel Arbitration**

Plaintiff does not dispute that the Deposit Account Agreement to which she was a party and that contains an arbitration agreement is a valid contract and binding on her. Indeed, she

affirmatively pleads that the "Wells Fargo Deposit Account Agreement is a binding contract entered into by Plaintiff . . . on the one hand, and Wells Fargo, on the other." Compl. ¶ 59; *see* Opp. Br. 11-12.  Nor does she dispute that her claims against Defendant ordinarily would fall within the broad scope of that agreement.

When applying for her Deposit Account, Plaintiff signed and submitted a consumer account application, dated December 16, 2011. Dkt. No. 20-1 (the "Application").  In the Application, Plaintiff acknowledged receiving a copy of the Deposit Account Agreement and agreed to be bound by its terms.  The Application stated:

> I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them, including the terms of the Direct Deposit Advance service described in the Service Agreement and Product Guide and any amendment or addendum (Direct Deposit Advance service currently not available in all states).

*Id.*

The "applicable account agreement" is the Deposit Account Agreement that contains an arbitration agreement.  In the Deposit Account Agreement, effective October 15, 2011, this agreement falls under the header "Binding arbitration," which reads as follows:

> If you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part. A "dispute" is any unresolved disagreement between you and the Bank. It includes any disagreement relating in any way to services, accounts or matters; to your use of any of the Bank's banking locations or facilities; or to any means you may use to access your account(s).
> . . . .
> "Disputes" include disagreements about the meaning, application, or enforceability of this arbitration agreement. . . . **YOU AGREE THAT YOU AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT.**
>
> As the sole exception to this arbitration agreement, you and the Bank retain the right to pursue in small claims court any dispute that is within that court's jurisdiction.

Dkt. No. 20-2. The updated Deposit Account Agreement, effective July 11, 2018, contains substantively similar language under the header "Arbitration Agreement between you and Wells Fargo," which reads as follows:

> **Arbitration Agreement between you and Wells Fargo**
> If you have a dispute, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.
>
> **Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.
>
> **Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to a small claims Court.

Dkt. No. 20-3.

It is thus apparent that Plaintiff agreed to arbitrate and that her claims fall within the scope of the arbitration agreement. The Complaint alleges that Defendant breached its agreement with her and violated the law by restraining funds in her account. But that issue is a "dispute" or an "unresolved disagreement between Wells Fargo and [her]" under the arbitration agreement. Dkt. Nos. 20-2, 20-3.

Plaintiff instead makes a single argument as to why the Court should not enforce the arbitration agreement, claiming that "Wells Fargo waived its right to arbitrate prior to the commencement of the instant action." Opp. Br. 12. In the words of the Complaint, "Wells Fargo, through its privy, co-conspirator, and agent Northern Leasing, prosecuted court proceedings against Plaintiff and others similarly situated in the Civil Court of the City of New York, obtained judgments against them, sought court process to enforce those judgments, and

seized funds from them pursuant to such process. Thus, Wells Fargo has chosen to have the matters . . . complained of decided in a judicial forum and has waived any right to assert the arbitration agreement in the Wells Fargo 'Deposit Account Agreement." Compl. ¶ 12; *see also* Opp. Br. 10 ("Northern Leasing, acting as Wells Fargo's agent, initiated legal proceedings in a judicial forum against Wells Fargo's account holders.")

The Second Circuit has long stressed that "there is a strong presumption in favor of litigation and that waiver of the right to arbitration is not to be lightly inferred." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (quoting *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968)). The Second Circuit has consistently laid out three factors for the Court to consider in determining whether a party who otherwise would have had the right to arbitrate has through participation in ligation waived that right: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Exposition Dist. v. Merrill Lynch*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995)).

Courts have denied motions to compel arbitration under the doctrine of "waiver" when a party who otherwise has the right to arbitration nonetheless participates in litigation to its adversary's prejudice, such as by engaging in extensive pre-trial discovery and motion practice, engaging in discovery procedures not available in litigation or delaying the invocation of arbitration rights by filing multiple appeals. *See PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 110 (2d Cir. 1997) (waiver where plaintiff sought arbitration only after five months of litigation and sought and obtained discovery it would not have been able to get through arbitration); *see also La. Stadium & Exposition Dist.*, 626 F.3d at 159 (waiver where

defendant expended significant resources in defending the suit, even though discovery was not yet completed). The key in every "waiver analysis is prejudice." *Thyssen*, 310 F.3d at 105; *see id.* ("Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.") (citation and quotation marks omitted).

Thus, for example, a party who has knowingly foregone the right to compel arbitration in order to secure litigation advantage or to cause its adversary excessive cost and time delay will not be heard to complain when it later seeks arbitration and the other side refuses to consent. In the words of the Second Circuit, "a litigant is not entitled to use arbitration as a means of aborting a suit that did not proceed as planned in the District Court." *La. Stadium & Exposition Dist.*, 626 F.3d at 161; *see also Welborn Clinic v. MedQuist Inc.*, 301 F.3d 634, 637 (7th Cir. 2002) ("[W]e do not want parties to forum shop, taking a case to the courts and then if things go poorly there, abandoning their suit in favor of arbitration"); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 890 (2d Cir. 1985) (holding that waiver can occur when a party "sensing an adverse court decision [is, in effect, allowed] a second chance in another forum") (citation and quotation marks omitted).[4]

Plaintiff has failed to establish the elements of waiver. First, Defendant did not participate, either directly or indirectly, in any dispute with Plaintiff either as defendant or as plaintiff. Although Plaintiff argues that Northern Leasing acted as Defendant's agent when it

---

[4] Both parties cite federal law with respect to waiver. South Carolina law is to the same effect. *See, e.g.*, *Rhodes v. Benson Chrysler-Plymouth, Inc.*, 647 S.E.2d 249, 251 (S.C. Ct. App. 2007) (citing identical factors to federal standards and stating that to ascertain whether the non-moving party was prejudiced, courts examine whether the party requesting arbitration took advantage of the judicial system by engaging in discovery).

11

sued Plaintiff in New York court, Opp. Br. 10-11, there is no well-pled allegation, let alone evidentiary fact, that Defendant caused the collection action, that Northern Leasing was acting on behalf of Defendant in connection with that lawsuit, that Defendant directed Northern Leasing, or that Northern Leasing was somehow a proxy for Defendant. And although Plaintiff alleges in conclusory terms that Defendant was Northern Leasing's co-conspirator, *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it does not identify any facts to suggest a co-conspirator relationship, much less that Northern Leasing was acting at Defendant's direction and with Defendant's participation in the collection action against Plaintiff. *See* Compl. ¶ 12; *see also* Opp. Br. 10-11. Even taking the allegations of the complaint as true, those allegations would establish a creditor-debtor relationship between Defendant and Northern Leasing at best. *See, e.g., In re Ames Department Stores , Inc.*, 144 F. App'x 900, 901-02, 2005 WL 1916360 (2d Cir. Aug. 10, 2005) ("[A]dding the words 'trust' or 'agency' to a contract does not, without more, convert an ordinary debtor-credit relationship into a trust or agency relationship."); *see also In re Shulman Transport Enters., Inc.*, 744 F.2d 293, 296 (2d Cir. 1984) (agency relationship must be determined by its character, including "the critical element of control"). Defendant loaned money to Northern Leasing and in return, received an obligation that Northern Leasing would repay the debt and security if it did not. The Northern Leasing finance leases gave Defendant a security interest. If Northern Leasing defaulted, Defendant would have rights in the leases, including in "present and future rental, lease and other payments and charges owed to lessor and all products and proceeds thereof." Compl. ¶ 22; *see also* Dkt. Nos. 1-1, 1-2.

The legend on the lease agreements did not convert the relationship between Defendant and Northern Leasing to an agency or co-conspirator relationship, much less deprive Defendant

of its contractual rights under the Deposit Account Agreement with Plaintiff. The language is standard in chattel paper provided as collateral for loans. Official Comment 5 to Section 9-330(a) of the Uniform Commercial Code states:

> [A] purchaser who meets the possession or control, ordinary course, and new value requirements takes priority over a competing security interest unless the chattel paper itself indicates it has been assigned to an identified assignee other than the purchaser. Thus subsection (a) recognizes the common practice of placing a "legend" on chattel paper to indicate that it has been assigned. This approach, under which the chattel paper purchaser who gives new value in ordinary course can rely on possession of unlegended, tangible chattel paper without any concern for other facts that it may know, comports with the expectation of both inventory and chattel paper financiers.

The fact that Defendant received and honored the restraining notice served by Northern Leasing after it obtained the judgment against Plaintiff does not make Defendant an agent or co-conspirator with respect to the litigation that resulted in the judgment. The default judgment was in favor of Northern Leasing; it directed the funds be paid to Northern Leasing and the restraining notice was said to stay in effect until the judgment to Northern Leasing was satisfied. *See* Dkt. Nos. 1-5, 1-6. The default judgment and restraining notice did not direct that any funds be paid to Defendant or evince that Defendant was Northern Leasing's principal. On its face, the process was identical to that which Northern Leasing would serve and was entitled to serve on any third party holding the property of a judgment debtor.

Second, even if the New York state lawsuit that created the judgment named Defendant as a plaintiff or one could substitute the name Northern Leasing for that of Defendant, there would be no waiver. The dispute that resulted in the judgment was not arbitrable; no party had a right to arbitrate that it waived. This is made clear by the very language of the personal guaranty in the lease agreements on which Northern Leasing sued and obtained its judgment. It states:

> All Disputes relating to this guaranty shall be litigated exclusively in the federal or state courts located in the State and County of New York notwithstanding that other

13

> courts may have jurisdiction over the parties and the subject matter, and I freely consent to the jurisdiction of such courts, including without limitation, the Civil Court of the City of New York. Lessor may properly serve me with legal process via certified mail by mailing same to my address set forth herein or to my current or last known address at the time of suit.

Dkt. Nos. 1-1, 1-2.

Finally, Defendant's actions have not expressed its intent to litigate the dispute in question or satisfied any of the *La. Stadium* factors: (1) Defendant moved to compel arbitration only two months after the Complaint was filed—before it responded to the Complaint and before any conference had taken place; (2) there has been no discovery or any activity other than the filing of briefs and exhibits in connection with this motion; and (3) Plaintiff has not identified any prejudice. If Defendant acted wrongly in honoring the restraining notice, Plaintiff can push that claim in arbitration; Plaintiff does not identify anything that either Defendant or Northern Trust has done in litigation that has prejudiced Plaintiff's ability to prosecute that claim.

**B.     Whether the Court Should Compel Arbitration on an Individual Basis**

Defendant asks that the Court order that arbitration take place on an individual basis. Plaintiff does not dispute that her contract with Defendant contains a class action waiver but argues that the enforceability and applicability of the class action waiver "would be a matter for the arbitral panel . . . to consider, but it would presumably apply and arbitration would proceed on an individual basis." Opp. Br. 16.

The FAA permits a party aggrieved by the failure or refusal of another party to arbitrate under a written arbitration agreement to petition for "an order directing that such arbitration proceed in the manner provided for in such agreement" and commands that, upon the court being satisfied that the making of the agreement for arbitration is not in issue, the court "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "The principal purpose of the FAA is to ensure that private arbitration agreements

are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)). Thus, "courts must rigorously enforce arbitration agreements according to their terms, including terms that specify with *whom* [the parties] choose to arbitrate their disputes." *American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (internal citations and quotation marks omitted).

The section of the Deposit Account Agreement, effective October 15, 2011, containing the arbitration agreement prohibits customers from participating in "class or representative actions":

> **NEITHER YOU NOR THE BANK SHALL BE ENTITLED TO JOIN OR CONSOLIDATE DISPUTES BY OR AGAINST OTHERS IN ANY ARBITRATION, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS, OR TO ACT IN ANY ARBITRATION IN THE INTEREST OF THE GENERAL PUBLIC OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.**

Dkt. No. 20-2. The corresponding section in the Deposit Account Agreement, effective July 11, 2018, reads:

> **Can either Wells Fargo or you participate in class or representative actions?**
>
> **No, neither Wells Fargo nor you will be entitled to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general.**

Dkt No. 20-3.

The parties do not dispute either that class waivers in arbitration agreements generally are enforceable, *see Am. Express Co.*, 570 U.S. at 235-36, or that this provision would preclude class arbitration of Plaintiff's claims. Accordingly, the Court will compel arbitration on an individual basis. *See Ross v. American Express Co.*, 35 F. Supp.3d 407, 454 (S.D.N.Y. 2014) (enforcing

15

arbitration agreement with class waiver); *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 474-75 (S.D.N.Y. July 12, 2013) (same).

**C.     Whether the Court Should Stay The Action Pending Arbitration**

Section 3 of the FAA directs a court, "on the application of one of the parties," to stay a suit or proceeding "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration" until the arbitration has been had.  9 U.S.C. § 3.  "[T]he Federal Arbitration Act, 9 U.S.C. § 1 *et seq*, requires a stay of proceedings when all claims are referred to arbitration and a stay requested."  *Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir.), *cert. denied*, 136 U.S. 596 (2015).  Defendant has moved for a stay and Plaintiff does not oppose a stay.  Opp. Br. 16.  Accordingly, the Court will stay this matter until the arbitration is completed.  *See, e.g.*, *Doe #1*, 2020 WL 882019, at *4 (staying case upon decision to grant motion to compel).

## CONCLUSION

For the reasons stated, the motion to compel arbitration on an individual basis and to stay these proceedings is GRANTED.

SO ORDERED.

Dated:  April 8, 2020
        New York, New York
                                                          _____
                                                          LEWIS J. LIMAN
                                                          United States District Judge